The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention, as the Court is now sitting. God save the United States and this Honorable Court. Good morning, ladies. Ms. Rickert, you may proceed. Good morning, and may it please the Court. My name is Julia Rickert, and I represent the appellants in this case, Daisy Jaimes and her parents, Gloria and Enrique. In November 2015, Daisy and Enrique were shot several times by Erica Aguirre, a Cook County Correctional Officer who was Daisy's ex-fiancee. Against all odds, Daisy and Enrique survived and are listening to today's argument. But Enrique, whose spinal cord was damaged in the shooting, is in a wheelchair, and he has limited use of his hands. Daisy lost an eye and still has bullet fragments lodged in her brain. Her appearance has been drastically altered forever. The Jaimeses would not be in this tragic position if not for Cook County Sheriff Tom Dart's nonsensical firearms mandate for correctional officers. Ms. Rickert, can I ask you a question? Is Mr. Jaimes, is he still, I assume he's still a plaintiff in this case? Enrique Jaimes? Yes. Oh, I'm sorry, Mr. Jaimes, yes, Ms. Jaimes, my father. The reason I ask that question is that I'm not sure where we draw the line on Duchenne liability with respect to a plaintiff like Mr. Jaimes' father, and I try to think about this in terms of if Ms., her last name is Erica, how is it you say, Aguirre, is that how she says her name? I believe it's Aguirre. Aguirre, okay. If Ms. Aguirre, take an example, if Ms. Aguirre had left her apartment to go to Ms. Jaimes' apartment and used her weapon to engage in a carjacking, so she didn't have a way to get to Ms. Jaimes' apartment, and so she carjacked somebody, and she didn't shoot him, but she used the firearm, she carjacked him, took her car, and drove to Ms. Jaimes' apartment, would that person be a proper plaintiff in this litigation or in separate litigation? In other words, how do we limit, what line do we limit to, what's the line here that we can draw as to who's a proper plaintiff in a situation like this and who's not? Sure. I think it is important that the plaintiff be in the zone of danger, a foreseeable victim of the danger that the government created. Under your hypothetical, I think that that particular person could potentially be a plaintiff, but we'd be highlighting some other past instances of correctional officer violence. There have been some serious road rage instances, including road rage instances that resulted in murder by a correctional officer with their service weapon. In this case, I think that because Daisy Jaimes is in the zone of danger as a domestic partner, I think that her family members as incidental victims would also be proper, are also proper plaintiffs here, but it is Daisy that provides that nexus and was in the zone of foreseeable victims. So, under the Sheriff's Bazaar policy, correctional officers who are prohibited from having a gun while on duty are forced to have one at home while off duty. Is that right? Is it at home or are they just forced to own one? I couldn't tell from the policy. I thought the policy was they were supposed to have a gun, but they didn't necessarily have to keep it at their home. Actually, the firearms policy is explicit that if they don't have the gun on their person, it is supposed to be in their home. It's supposed to be locked, which is good, but of course, the correctional officer has ready access to the firearm and otherwise, it must be on their person, but of course,  ironically, the weapon is called in all the policies a duty weapon, but while on duty, they cannot carry it, yet they must own it. This requirement, this arbitrary requirement is imposed despite the correctional officers because of the grueling and highly stressful nature of their work, suffer from high rates of PTSD and are at a heightened risk for committing domestic violence. Compounding the problem, the sheriff requires jail supervisors to stick their head in the sand to avoid seeing when correctional officers like Aguirre begin to unravel, even when there are many red flags at work. Unsurprisingly, the strange firearms mandate the sheriff has imposed is contrary to industry practice and the defendants have not identified another jail or prison that imposes such a mandate. And, you know. Ms. Rickard, do we know anything about the history of this policy? Does this date back to the time when, in essence, any, virtually any private possession of a handgun in Chicago was lawful? I believe that it does. The records that we obtained in this case only go back to 2007, but I believe there is testimony from one of the 30 of these six witnesses that the policy long predates the, you know, his time with the department. And so I don't have an exact date when it was instituted. I can say that it post-dates 1970. There was actually, you know, this isn't part of the briefing, but there was an Illinois the statute that requires firearms training for the police officers and the peace officers, I should say, and the Illinois Supreme Court said that correctional officers, you know, were not peace officers at that time. Since then, the sheriff has opted to deputize them, arguably causing them to fall under the peace officer, or the peace officer statute. But prior, you know, certainly in 1970, they did not. Can I ask you, Ms. Rickard, to address the LaPorta case, which obviously rejected a Duchenne state-created danger claim that is at least comparable to this? Well, first, I would say that, you know, the plaintiff in Duchenne did not raise or develop or have the jury instructed on LaPorta. I'm sorry, yes, the plaintiff in LaPorta did not raise a state-created danger claim. The jury wasn't instructed on that. And, you know, there doesn't appear to have been any effort to develop evidence in that would say that there's a huge difference because of the huge difference between police officers who are on duty at all times and, you know, have reason to be armed at all times because of their responsibilities, duties, and training. But correctional officers should not be armed like police officers.  There's no justification, which we'll probably talk about the purported justifications that the county has offered. But, you know, additionally, LaPorta actually, you know, confirmed and arguably elevated the previous, it was the Gibson case. I had a footnote about how an argument that arming someone and training them to shoot would create danger. And while that case is sort of confined to its, you know, its stage, which was a motion to dismiss by LaPorta, LaPorta did not reject the idea that this sort of danger, arming an employee, you know, could be a danger that would fall under the Duchenne state created danger. Would the same logic apply to training and, for example, martial arts or hand-to-hand techniques for dealing with unruly prisoners or suspects? No, yeah. First of all, there would be, you know, reason to, you know, train correctional officers and those kinds of techniques. But additionally, you know, guns are uniquely lethal. That's the idea. That's the point. They are designed to, handguns in particular, they're designed to kill humans efficiently and from a distance. And that's why, you know, people want them for protection. That's why police officers carry them. They are, you know, lethal in an entirely different way. And, you know, I think it's a fair assumption that if Erika Aguirre had gone into the Jaime's home with nothing but, you know, some martial arts moves, we would not be in this situation today. Ms. LaPorta, can I ask you one question? Ms. LaPorta, I'm sorry. Following up on, Ms. Rueckert, following up on LaPorta. Are you aware of any Seventh Circuit cases where we have held that a particular policy shocks the conscience? Yes. I mean, the most, you know, on point would be the Ross against United States case. But we didn't, I don't think that was a, we didn't decide that on shock the conscience, did we? I mean, and by the way, that policy was, you read that positive, whoa. I mean, that is, and the reason I ask, I look at these policies that I found cases that shocked the conscience. It seems like these policies involve sort of manifestly outrageous behavior. And it's certain to cause harm. Here, I'm just, I'm concerned that, do you have any parallel in the Seventh Circuit or any other circuits where we could hold a policy like this shocks the conscience? Well, I would, I would clarify that in the, in the policy context, the shocks the conscience test, you know, is, is, is really a deliberate indifference test. I think the, as I understand it, the, a policy that's deliberately indifferent, you know, to a substantial risk of harm, you know, always shocks the conscience because, you know, if it's unjustified, there's no reason to do it. While the Ross policy is, you know, disturbing, certainly, and I think that that was, you know, a big part of why the court found that this, you know, if, if proven would, would fall in the state created danger context, you know, is because the, the county didn't, didn't mitigate the risk it created. If the, if, if Lake County had had, you know, rescuers on site, then they, you know, this would be less shocking, but, but they didn't. And while I think, well, it might initially sound rational to arm, you know, sheriff's deputies. I think that when you dig a little deeper here and, and, and look at what the requirements are for correctional officers, what their job duties are, and, you know, start to, you know, analyze these justifications that, that the county has put forward that do not stand up to scrutiny. And that I think a jury could find to be completely disingenuous, you know, not unwise, not, you know, poor policy, but, but, but not the reason. But I guess, I guess what my, my question is, what difference does it make? I mean, we're not policy makers. What if the sheriff had just said, you know what, I'm a huge second amendment person and I want my corrections officers who by the way are hired, I mean, we're not arming inmates, we're arming corrections officers. And I want my correction officers who we've employed, we've, you know, we've, we've done all these tests to hire them. I just want them to carry guns. I'm not giving any reason for it whatsoever. What difference does that make? I mean, sure, guns are, guns are dangerous and guns perhaps increase the risk of violence, I guess. But what difference does it make if the sheriff had just said, I just want him to have guns and that's it. That's the reason for the policy. Sure. I, you know, as this court said in Payne against Kaysen, you know, state actors who without justification increase a person's risk of harm violate the constitution. I don't know that putting it in a, in a policy, you know, should, you know, save it from that analysis. But, but furthermore, you know, you mentioned the second amendment and, and I, I realized that most cases are involved, you know, who should be permitted to own a gun, what kind of limitations the government can put on gun ownership. You know, these are, are, are fraught, highly charged issues, but here we're not talking about anyone's individual right to bear arms. We're not talking about the, the risks that society accepts in the name of liberty. You know, constitutional rights often have, you know, a, there's, there's a, you know, the fourth amendment prohibits searches without probable cause, and that means some crime goes undetected, and we accept that risk for the sake of liberty, but that's, that's not the issue here. We're talking about something way on the other side of the spectrum, spectrum, and that's the government forcing guns into, into employees' homes for no reason. And you know, that is not about individual rights, and the only constitutional rights at issue here are the due process rights of the Jaime's family. So I don't think that the, that the government can, you know, arbitrarily, I mean, arbitrary in the constitutional sense, you know, comes up in these cases, and, and this is one of those that fits right, right in there. That's not always, you know, easy to apply, but, but this is, this is arbitrary. This is, this is not, this is, you know, we've stressed that the, the test is not, this isn't rational basis scrutiny, and we're talking about deliberate indifference, but I, I don't think it passes, you know, rational basis, and I certainly think a jury could find that, that it does not. So I think that, you know, key, as I've mentioned, to understanding the claims in this case are, oh my goodness, I just see that the time on the clock is at zero. I was meant to reserve time, and I did not. It was just a moment ago, but you hit zero. I'll give you another minute. For a while. Thank you very much. My, my apologies. I caught up in the conversation. So do we. Thank you. May it please the court. Off duty correctional officer, Erica Geary, dressed in head to toe black clothing, including a black ski mask before she broke into the basement home, into the basement window of the Jaime's home. After entering that home, she shot at each family member she came across, and then she took her own life. The district court correctly found that no jury could find that a Gary was acting under color of law and plaintiffs are not contesting this finding. Rather, they're seeking to hold the Cook County Sheriff's Office responsible for the violent acts based on the sheriff's policy of requiring the correctional officers to purchase a duty weapon. And there's simply no constitutional basis to shift the blame to the sheriff. This court recently clarified in the Porta that in cases such as this one, where the plaintiffs are seeking to hold a municipality liable for private acts of violence, plaintiffs must establish a constitutional violation in addition to the elements set forth in Monell. Accordingly, even if the requirements of Monell are met, they still must establish the constitutional requirements that are set forth into Cheney. Keeping in mind, as this court said in Laporta, that the state created danger exception is a narrow one. And as Judge Kirsch pointed out earlier, and as this court has said in Doe versus Arlington Heights, it's only been found to apply in those rare and egregious cases. The policy at issue that we're talking about here is, again, the sheriff requiring correctional officers to purchase weapons that they will use in the in the course of their or may use in the course of their job responsibilities. What does the evidence tell us about how many correctional officers actually take on duties that require them to carry weapons on duty? Well, there's really there's two components to it, and we don't have an exact number that I can give you based on the evidence. I mean, is it 1 percent? Is it 90 percent? It's it's a small percentage of officers. There are officers who are have permanent permanent assignments to external operations and any correctional officer could be assigned on that permanent basis to external operations where they are required to carry a firearm or separately from that, any correctional officers such as Erica Geary, who is assigned to another location within the jail that does not on a day to day basis allow any correctional officers to be armed. They could be called to fill in on a temporary basis into or to assist on a particular assignment. So that might might justify requiring training, but it's a little hard to see that rationale extending to mandating keeping a firearm at home. There are over 3000 correctional officers in the Cook County Sheriff's Office, and each of those officers is trained on a yearly basis. They are trained on how to maintain the firearms. They are. You know, I understand that, but if if only a tiny fraction are going to be using them on duty, there seems to be a kind of wildly disproportionate fit between rationale and policy. I think it really has to be looked at from the opposite view. If we were any of these officers could be called upon at any time to use a duty weapon. So if we were looking at a case where an officer is called for the first time after, say, three years on the job and they are required to go assist in transporting a detainee to the hospital and use a firearm and something goes wrong and we haven't trained them properly, they haven't had the responsibility of owning and caring for that gun and using that gun in the course of their training. And the first time that they are called upon to use that gun, we say, well, we wait. Yeah, but you don't you don't require them to carry when they go out in public. You don't require them to use or practice any more than kind of just the standard yearly training, right? Correct. They're only required to carry outside of when they're on the job outside of the jail. OK, can I ask you about the state law claims, Ms. Echol, because I'm frankly troubled. This is this is a very challenging area of federal law for plaintiffs. But it is not that. It doesn't seem quite as as much of a reach under state law. And I'm troubled by the the at least where we are now, which is if we were to affirm on the federal law claims and deferred to the district judges relinquishment of supplemental jurisdiction on the state law claims, these plaintiffs apparently would be blocked in state court. My question and I know there's debate about whether people whether the district judge was alerted to this kind of potential consequence of the summary judgment motion. But would the defendants be willing to waive or forgo their ability to block litigation in the state courts based on the prior filing in the statute of limitations? Or should we consider insisting that the district judge handle only the state court claims if we were to affirm on the federal ones? We would not be willing to waive that. The plaintiffs chose to file their initial lawsuit in state court. That was their decision. And they were not removed to federal court. They chose to dismiss that complaint and to remove it and to have it filed in federal court. That was their choice. They didn't have to do that and they weren't forced by law to do that. They chose to do that. They also then defendants specifically asked in their opening brief and summary judgment as an alternative that this court not exercise its supplemental pendent jurisdiction. They didn't respond to that. And even after the court issued its opinion, they didn't file any kind of other motion and before the court to try to do anything to establish the fact that these state law claims were out there and that they would not be able to go back to state court. And so that was that was their choice. You agree that the plaintiffs are blocked from going further into state court? Yes. And you're not willing to give it? Okay. So if there's any chance it has to be in federal district court? Correct. Under supplemental jurisdiction. Okay. The the policy at issue in this case, as I said, is not it is not an arbitrary policy. There are instances where correctional officers may be called upon to use their weapons. But under the state created danger exception, plaintiffs must show that the sheriff's failure to protect them from danger created by the policy was the proximate cause of their injuries. And in Laporta and Buchanan Moore versus County of Milwaukee, this court held that to satisfy the proximate cause requirement, the state created danger must entail a foreseeable type of risk to a foreseeable class of persons, not a generalized risk of indefinite duration. It is not foreseeable that correctional officers will commit off duty for forcible felonies like the one that a Gary committed here, just because they are required to purchase their duty weapons. Is there a risk that a person who owns a firearm? Could you misuse it? Well, yes, of course. But that is the generalized type of risk to the public that doesn't meet constitutional requirements. The question is, does this policy create a foreseeable risk that off duty correctional officers are going to break into the homes of someone they know and use that And the answer is clearly no. The sheriff hires correctional officers who have undergone rigorous screening processes who are trained in the proper use of firearms and are required to adhere to strict rules of conduct related to their activities, both on and off duty. It is not foreseeable that a policy requiring them to purchase the weapons that they may be required to use during the course of their jobs will result in the injuries that we've seen here. Plaintiffs assert on page six of their opening brief that the risks are widely known, but they only point to two instances in the five years preceding this event, one in 2010 and one in 2014, where a correctional officer shot his wife and then killed himself in their own home. Even assuming that officers used those officers used weapons that they were required to use during their job, which is not clear from the record, plaintiffs are only pointing to two incidents out of two of approximately 3800 correctional officers over the course of five years. And that hardly makes it foreseeable that a Gary would take her duty weapon to her ex-girlfriend's house and go on this shooting rampage that we that we have here. A Gary herself owned that weapon for five years without incident. During that time, her girlfriend lived with her and they had an on and off relationship, and there was no no incident involving her weapon. Plaintiffs are also unable to provide evidence to establish the first prong of Deshaney that the sheriff's policy of requiring officers to purchase their duty weapon created or increased the danger. And this court in Buchanan Moore interpreted that prong as a requirement that affirmatively places a particular individual in a position of danger that that individual would not have faced. And in Doe, this court cautioned that Deshaney cannot be circumvented by broadly interpreting what is meant by increase so as to erase the essential distinction between endangering and failing to protect. And that's really what the plaintiffs are trying to say here is that we should have been we should have done more to protect these particular individuals from Erica Gary, and that's simply not the law. The cases such as the Ross case that did find a policy was unconstitutional and did place the plaintiffs at risk are highly distinguishable from the facts that we have here. And in particular, as the last prompt, the sheriff's actions certainly were not conscious. Shocking in the state of her. This court found that court shall only find the conduct to be conscious. Shocking when it even if it says a deliberate indifference to the rights of the individual. Plaintiffs, what do we do with our case law, at least with respect to Deshaney, where we have said it's not necessary to show that harm is going to be certain for a particular individual? That seems to suggest to me we're on a pretty wide scale from zero to 100. Well, it may not it may not be certain, but it must it there must be it must be conscious. It's shocking to the point where you look at it and say that the policy was so was was so likely, whether it was certain or not, it was so likely it was it was nearly criminal or it was criminal to have imposed the policy. And that is consistent with other cases in the court. The firearms policy in this case. Or plaintiff's argument in relation to the firearms policy in this case ignores the steps the sheriff has taken on the numerous steps to shake the sheriff has taken to defuse any possible danger that his firearms policy could cause. I was having ignored it. You all just seem to disagree about the effectiveness of the red flag. Processes, right? Plaintiffs are arguing it becomes a way to. Ignore or vary problems you're you're saying they're effective. I'm not sure where that leaves us, but suppose there's a constitutional result depend upon the presence or effectiveness of the sheriff's. Processes for mitigation of potential risk. Absolutely not what it shows all these steps that the sheriff has taken to defuse it. What it shows is that he recognizes what we all know, which is that a firearm can cause can cause injury and that he has taken steps to defuse that, but having more or better policies in relation to those firearms is not what's at issue here. It's whether or not his policy in and of itself shocked the conscience and caused this injury to the plaintiffs, and clearly it did not. And the sheriff in this case goes above and beyond. What the Constitution requires to try to defuse any possible danger. Based on that small possibility that something terrible could happen when an officer is off duty and owns and owns a weapon. It's not just the training. It's again, starting with who he's hiring and looking at there are he puts programs into place like the employee assistance program and the peer support program to address the fact that yes, there's an acknowledgement that correctional officers jobs are stressful and to help defuse those stresses. He has, there are fitness for duty examinations for officers who have been identified by any of their supervisors or anyone who brings it to the attention of a supervisor that that person is a possible danger to themselves or others. And in Erica Gary's case there wasn't that those things were in place, but nothing ever triggered a fitness for duty examination because there simply was no belief by anyone at work or in her personal life that she was going to commit these acts. I see that my time is running out, I would just. I would just ask that obviously the court consider our briefs and for these reasons and as set forth in those briefs, appellees respectfully request that the court affirm the judgment of the district court. Thank you, Ms. Echol. Ms. Rueckert, you gave you, you have another minute. Thank you, Judge Kaney. And I'm going to try to go through a few points pretty quickly here. You know, the justifications that they've given that an officer could be called to, you know, work outside the jail and need a firearm at a moment's notice, you know, don't require the correctional officers to bring their duty weapons to work with them. So that they would not be able to call them to, to go out and use a gun or carry a gun on a moment's notice. So a jury can certainly, you know, not credit that reason. And, you know, they talk about, oh, it's only, you know, two prior to the Jaime's shooting. It's only two instances before that. You know, this is not a good record. They've screened these people in advance and found they have no criminal record. I, you know, if a small town had this rate of spousal murder, they would, you know, recognize a problem. And there were other shootings that should put them on notice. And Erica Aguirre had many red flags at work. She was afraid of her colleagues. She was, many things were happening that should have triggered their, their concern. I assume that my time is up. I ask that you reverse and remand all claims to state court. And equity does dictate that the state law claims be heard. Thanks. Thanks to both counsel. And the case will be taken under advisory.